No. 97.—BENJAMIN W. WALKER, plaintiff in error, *vs.* MANS-FIELD TORRANCE, administrator *de bonis non*, with the will annexed, of James C. Watson, deceased, defendant.

[1.] There is nothing either in the constitution of the old *Provincial* Court of Ordinary, or in that of the existing Courts of Ordinary in Georgia, nor in any statutory provision, concerning executors and administrators, that makes the non-residence or absence of an executor *after probate*, either a disqualification, *per se*, to hold the office, or a cause of revocation of letters testamentary by the Ordinary.

Motion, in Muscogee Superior Court.  On appeal from Ordinary  Decision by Judge IVERSON.  November Term, 1852

For the facts, see the decision of the Court.

WELLBORN, for plaintiff in error.

W. DOUGHERTY, for defendant in error.

*By the Court.*—LUMPKIN, J. delivering the opinion.

James C. Watson, a citizen of Muscogee County and State of Georgia, in the year 1843, made his last will and died.  The will was duly admitted to probate and record, in the Court of Ordinary of Muscogee County, at May Term, 1843, and letters testamentary were granted to John H. Watson and Benjamin W. Walker, two of the executors named in the will.

Subsequently, complaint was made in said Court, that the ex-

ecutors had failed to make any returns or render any inventory and appraisement of said estate; upon which such proceedings were had, that at the January Term of that Court, 1846, the letters granted to John H. Watson were revoked, and then Benjamin W. Walker became the sole acting executor.

At June Term, 1846, in the same Court, proceedings were instituted to compel the executor, Walker, to give security, upon the ground of his being in an insolvent condition; and for revocation of his letters testamentary, because he had removed from the State. No further action was ever had in that case. But at the same July Term, a precisely similar proceeding seems to have been instituted, and process by advertisement, was ordered and made; and the Court at the January Term, 1847, upon this latter proceeding, ordered Walker's letters to be revoked, on the ground of his having removed from the State.

At the July Term of the Court, 1847, letters of adminstration *de bonis non cum testamento annexo*, were granted on said estate, to Mansfield Torrance.

At June Term of said Court, 1852, a motion was made by Benjamin W. Walker, to set aside the letters granted to Torrance.

1. Because, among other reasons, the same were granted improvidently, and to the prejudice of the rights of Walker, previously acquired, as executor under the will; and

2dly, Because the ground on which the order revoking the letters testamentary to Walker was granted, was insufficient in law to authorize the same.

The motion was overruled by the Ordinary.

An appeal was taken to this decision to the Superior Court, and upon the trial thereof, Judge *Iverson* instructed the Jury, that according to the case made, as above stated, that the Court did not err, in revoking Walker's letters; and that they should find the issue against Walker, which the Jury accordingly did. To which charge Walker, by his counsel, excepted.

[1.] And the single question for our review and determination is, and it is a very momentous one, have the Courts of Ordinary, in this State, either as the representative of their En-

glish prototype, or by Provincial or State Legislation, since their establishment here, the power to repeal a probate, or revoke letters testamentary, and deprive an executor of his office, on the ground of his having removed from Georgia?

It would be interesting, if time would permit, to investigate fully and at large, the nature and extent of the jurisdiction and functions of the Court, whose acts are now under examination; to go back to the original constitution of the Provincial Ordinary of Georgia, at the date of the Revolution, and thence trace his jurisdiction in its transmission to his several successors under State authority, so as to ascertain with precision, the condition in which that jurisdiction after the extension and modification it has received from State Legislation, has ultimately vested in the last of these successors, the Ordinary of each County. It is curious enough, that like all other fashions, after undergoing so many changes and passing through so many transmutations, it has ended where it first begun, in an *Ordinary*, which was the title originally conferred upon this provincial official or deputy of the English Ordinary, in this and the sister Province of South Carolina.

The position assumed by the able counsel for the plaintiff in error is, that so long as the executor named, continued qualified for the performance of his duties, the Court possessed no power to revoke or set aside his authority. And the English and American authorities alike sustain the principle that nothing but the want of qualification on the part of the executor, can give to the Court of Ordinary, power to revoke letters after they are once granted; a Court of Equity cannot interfere.

In England, *before probate obtained*, a limited administration *durante absentia*, has been granted; but this was revoked upon the coming of the executor into the realm. *Williams on Ex'ors*, 1 vol. 314. After probate obtained, there must be some positive act disqualifying the executor, to authorize the Court to interfere. It has been decided by the Supreme Court of the United States, that so long as a qualified executor is capable of exercising the authority with which he has been invested by the testator, that authority cannot be conferred, either with or without limitation

by the Court of Ordinary, upon any other person. *Griffith vs. Frazier,* 8 *Cranch,* 9.

What amounts to a disqualification on the part of the executor? Is the removal of an executor from the State a disqualification?

In England, previous to the Statute 38 *George III. c.* 87, which is subsequent to the Revolution, the removal of an executor beyond the *Realm,* did not authorize the Court which had granted letters testamentary, to revoke or disregard them on that ground, or to grant new adminstration. 3 *Term Rep.* 125. 2 *Bacon's Abr.* 376. *Smith vs. Miles,* 1 *T. R.* 480. This Act was passed in consequence of the great incovenience to creditors and legatees, from the difficulty thrown in the way of bringing the executor to account, and recovering their debts and legacies, in consequence of the executor's absence after probate; and it was restricted in its operation to the single case of a suit in Chancery, instituted by a creditor or legatee, for an account and for the satisfaction of his debt or legacy; in which case the Ordinary was authorized to grant a special administration, limiited to a single purpose, that of the administrator becoming a party to the bill and carrying the decree into effect. The executor was still left in the full possession and enjoyment of his office and of all the rights, personal and proprietary, appertaining to it. The special administrator could in no sort meddle with the assets or with any part of the administration, otherwise than by executing the decree in the particular suit to which he had become a party. 1 *Williams' Executors, pp.* 391, 397, *last edition.*

It has been solemnly decided by the Supreme Court of the United States, in two cases at least, that the executor's removal from the State where he had obtained his letters testamentary, and his continual non-residence, was no excuse for revoking his office and bestowing administration upon another. *Griffith vs. Frazier,* 8 *Cranch,* 9. *Kane vs. Paul,* 14 *Peters,* 39.

Indeed, I understand the general rule to be, that the probate Court having made an appointment, cannot remove the incumbent, but for some defined statutory cause. Is there any au-

thority to be found in the legislation of the State to revoke let-
ters testamentary, on account of the removal of the executor from
the State, or making his absence a disqualification for the office?

The Act of 1805, §7, is relied on alone, to sustain this prop-
osition ; which declares, that " no letters testamentary or of ad-
ministration, *shall be granted* to any person, who is not a citizen
of the United States, residing in the State of Georgia." *Cobb's
New Digest,* 283.

This law I believe is an anomaly in legislation. And its ori-
gin is curious enough, as related by its author, to one of the
members of this Court. It was to prevent the representatives of
an alien brother resident in Nova Scotia, from litigating in the
Federal Courts, a claim to property held in Georgia, and where,
from the opposite sides which the parties took in the Revolution,
it was supposed, that the *locum tenens* would be omnipotent in
the State tribunals. The propriety of such an Act, unprecedent-
ed as it is, as applicable to administrators, I am willing to con-
cede. But for myself, I esteem it utterly incompatible
with the sacred right of every citizen, not only to dispose of his
property by will, but to select at his own discretion, the execu-
tor to whom he will trust the management of his affairs, and the
interests of his family after his death. The testator has an only
son or some near relative residing in the neighboring States of
South Carolina or Alabama, but dying, under the arbitrary
provisions of this Statute, he must forego the privilege accord-
ed to others in every other State in the Union, or civilized coun-
try on the globe, and appoint his executor from among strangers
or leave it to the Ordinary, after his death, to select a represen-
tative for him.

But *ita lex,* and unless the grantee fulfil both the statutory
requisites of citizenship and residence, this statutory prohibition
disqualifies him for receiving the grant. Be it so. But suppose
he fulfilled both the requisites, and was endued with every legal
qualification for the office, when he received the grant, what
is there in the Statute to constitute removal or absence from the
State at a future time, a disqualification for *continuance* in office,
and a ground for depriving him of all the vested rights of pro-

perty which had been inherent in him, for the three or four years that he had held and enjoyed the office in the State.

The law plainly refers exclusively to his qualification at the time of receiving the grant; and being then perfectly qualified, and the grant consummated, and all the rights of property incident to it, fully vested, there is no semblance of an intent to provide for his future disqualification for *continuance* in the possession of the office, and of the proprietary rights incident to it; and to divest him of all these rights, because after some three or four year's possession, he happened to cross the Chattahoochee, and take up his abode in Alabama. Non-residence at the time probate should be granted, was doubtless contemplated as equivalent to the *absentia*, which authorized the Ordinary in England to grant temporary administration; but which occurring after probate, interposed no obstacle to his continued possession of the office and discharge of its duties. This restriction in the Act of 1805, being contrary to the Common Law and British Statutes of force at the time of our adopting Act, should be construed strictly.

But if this construction of the Statute, considered *per se*, or in the light of the contrary cotemporaneous construction which we admit has been put upon it, were at all doubtful, it is fully and incontrovertibly confirmed by subsequent Statutes, in *pari materia*, which plainly infer the continuing capacity and qualification of the executor to hold and exercise his office in the State, notwithstanding his residence *beyond the limits of the State.*

One Statute allows the *annual returns* required of executors, which are required to be verified by their affidavit, to be verified by the affidavit of the surety, when the executor shall reside *beyond the limits of the State.* Cobb's *New Dig. p.* 333, §140. These annual returns exhibit all the transactions of the executor in the course of his administration, from year to year. But if he be deprived of the office—divested of all the rights incident to it, by reason of his non-residence, he is necessarily discharged from all the duties and responsibilities of the office; and so he could have no " *annual returns*" to make; his official trans-

actions ceasing, his "*annual returns*" necessarily cease. Then, if his "*annual returns*" be still required, or be even permitted, notwithstanding his non-residence, it follows as a necessary consequence, that his continued performance of all the functions and duties of his office, is in like manner required. The facility afforded him of substituting his security's oath for his own, can have but one rational purpose or end ; that of enabling him so much the more conveniently to carry on his practical administration as executor during his absence. He thus saves the forfeiture of his commissions by failing to make his annual returns, besides his liability to an action for damages; and places upon the records of the Court, the necessary evidence for his own protection, as well as that of his bondsman.

It would indeed be a strange solecism for the law to deprive him of his office for no other reason but non-residence, whilst for the very same reason, it supplied him with additional means or facilities for performing all the duties of the office. It is impossible to reconcile the deprivation of office, with the still continuing call for annual returns.

But there is another Statute of Georgia, that imports an equally clear and unequivocal recognition of the compatibility between the absence or non-residence and the still continuing functions and responsibilities of the executor. It provides for the service of orders or rules upon executors, &c. who are "alleged to be *mismanaging the estate* which they may respectively *represent*," to show cause why they should not be compelled to *give security*, or in default of doing so, why their executorship should not be *revoked;* and in all such cases, service by leaving a copy at the party's abode, *or if he shall have removed out of the limits of the State*, then by publication in a gazette, shall be equivalent to personal service. *Cobb's New Digest, p.* 326, §115.

Thus it seems, that while the executor resides out of the limits of the State, after his removal to another State, he may still be "*mismanaging the estate;*" and of course still administering the estate; and his executorship may be revoked, not because, nor on the ground that he has removed out of the limits of the State,

but because he is "mismanaging the estate," in the course of his recognized administration while resident in another State.

There is clearly nothing then, either in the construction of the old Provincial Court, or in that of the existing Courts of Ordinary in Georgia, nor any statutory provision concerning executors and administrators, that makes the non-residence or absence of an executor after probate, either a disqualification, *per se*, or a cause of revocation by the Court of Ordinary.

And to exhibit still more stikingly, the increasing spirit of liberality on the part of the Legislature, in relation to this subject, I would refer in conclusion, to the Act of 1850, (*New Digest*, 341,) which authorizes foreign or non-resident executors, to bring suit in this State for the recovery of any cause of action against citizens of this State, owing to their testator at the time of his death, without requiring an inhabitant of this State first to take out letters of administration upon the estate of the deceased. All that is required, being that the legal representative shall, on or before the judgment term of the Court to which the suit is brought, file in the Court where the action is pending, a legally authenticated exemplication of the letters under which the action is brought.

With my sincere acknowledgements of indebtedness to the very able briefs which have been submitted on the argument, it only remains to reverse the judgment of the Circuit Court, and to remand the cause for a re-hearing. It being the unanimous and emphatic opinion of this Court, that the office of executor, having been properly conferred upon Benjamin W. Walker at the time of his appointment, his subsequent removal beyond the limits of the State did not work a forfeiture thereof, or justify the Court in revoking his letters testamentary, on that account.